UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAZEN BERRI,

        Plaintiff,

v.                                                                Civil Case No. 13-15061
                                                           Honorable Linda V. Parker

DEARBORN PUBLIC
SCHOOLS, BRIAN WHISTON,
and CHARLES BAUGHMAN,

        Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On December 12, 2013, Plaintiff initiated this action against Defendants under Title VII of the Civil Rights Act of 1964, alleging that he was suspended from his coaching position at Dearborn High School ("DHS") based on religious discrimination (Count I) and national original discrimination (Count II).  Plaintiff is an Arab American of Lebanese descent who practices the religion of Islam.  (Compl. ¶¶ 9, 10.)  Presently before the Court is Defendants' motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56 on December 3, 2014.  (ECF No. 19.)  The motion has been fully briefed (ECF Nos. 22, 23). Finding the facts and legal arguments sufficiently presented in the parties' pleadings, the Court dispensed with oral argument pursuant to Eastern District of

Michigan Local Rule 7.1(f) on March 12, 2001.  For the reasons that follow, the Court now grants Defendants' motion.

## I. Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence

upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

**II. Factual Background**

Plaintiff is a former Dearborn Public Schools ("DPS") student and a graduate of DHS. He played football on DHS' team during high school and volunteered his time as an unpaid football coach after graduation, working with the lower-level football teams. Plaintiff eventually was hired in 2005 as a paid coach on DHS' junior varsity team.

Prior to the 2011 football season, DHS' head varsity football coach, David Mifsud ("Coach Mifsud"), promoted Plaintiff to the varsity coaching staff as the defensive coordinator. Plaintiff coached the 2011 and 2012 football seasons as part of the varsity coaching staff.

On December 25, 2012, while the school district was on holiday recess, Plaintiff, along with some friends, went to DHS to play paintball either on school grounds and/or the state owned wooded area behind the school. Plaintiff used his school district-issued keys to open the gates to the DHS athletic fields, where two cars parked on the lower baseball fields.

Someone called the police, reporting that they saw a red Honda Pilot vehicle on school property which had a rifle or shotgun inside, on the dashboard. (ECF No. 19, Ex. D.) Four Dearborn Police Department officers reported to the scene, where they located the Honda Pilot and a second vehicle, a white Chrysler. (*Id.*) Tracks from the school driveway led onto a sidewalk and down to the fields where the cars were parked. From a distance, the officers observed two individuals standing between the vehicles with what appeared to be weapons in their hands. (*Id.*) The individuals subsequently were identified as Plaintiff and Ray Berri ("Ray").

The officers approached Plaintiff and Ray with their weapons drawn and ordered them to drop their weapons. (*Id.*) Both individuals did so and then the officers ordered them to the ground for officer safety. (*Id.*) While Ray immediately complied, Plaintiff did not and challenged the officers' orders. (*Id.*) After the officers repeatedly ordered him to the ground, Plaintiff complied but refused to position himself prone as directed by the officers. (*Id.*)

Once the officers secured the weapons and discovered that they were paintball guns, they allowed Plaintiff and Ray to get up and spoke with them. (*Id*.) Plaintiff indicated that he and Ray were part of a group of people who, on numerous occasions, had come to the school to play paintball in the woods. (*Id*.) Plaintiff and Ray indicated that some people already were in the woods. (*Id*.)

The officers advised Plaintiff and Ray that they were not allowed to be on school property for that purpose and could not park their cars as they had done. (*Id*.) According to the officers, Plaintiff became argumentative, stating that he was an employee of the school and Wayne County and had keys to the property. (*Id*.) The officers advised Plaintiff and Ray to leave the school grounds.

Plaintiff and Ray then gathered their property. According to the officers' report, as they left, Plaintiff "continued his argumentative behavior complaining again that he worked at the school" and was an employee of the Wayne County Executive. (*Id*.) The officers reported that Plaintiff "appeared unconcerned with the fact that he was in possession of any type of weapon on school property, despite a recent mass killing of students and teachers at an out of state school as well as a separate shooting of first responders more recently." (*Id*.) The officers

neither ticketed nor arrested Plaintiff and Ray.[1] They were allowed to keep their paintball guns and equipment and left the school.

On the day that school resumed, January 7, 2013, a teacher at DHS asked DHS' Principal, Defendant Charles Baughman ("Principal Baughman"), what happened between one of the football coaches and the police at the school during the recess. (ECF No. 19, Ex. E at 9-10.) Principal Baughman, up to that point unaware of the incident, called the Dearborn Police Department to find out what had transpired. (*Id*. at 10.) Two of the officers involved in the incident then came to the school on January 7, and informed Principal Baughman about what had happened. (*Id*.)

---

[1] In his brief submitted in response to Defendants' motion, Plaintiff states that one of the officers made some derogatory statements to Plaintiff after Plaintiff insisted that he was not doing anything wrong. (ECF No. 22 at Pg ID 321.) Plaintiff also states that the officer stated that he was going to personally make sure Plaintiff was reprimanded by his superiors. (*Id*.) Plaintiff, however, cites only his Complaint in support of these factual assertions. (*Id*.) The Complaint is neither verified by Plaintiff, sworn to, nor made under penalty of perjury. (*See* ECF No. 1.) It thus does not constitute evidence the Court can consider on summary judgment. *Turney v. Catholic Health Initiatives*, 35 F. App'x 166, 168 (6th Cir. 2002) (finding that because the plaintiff did not verify her amended complaint or state that her allegations were made under penalty of perjury, it was not sufficient to defeat the defendants' motion for summary judgment); *cf El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir.2008) (indicating that a "verified complaint ... carries the same weight as would an affidavit for the purposes of summary judgment . . . to the extent that it is based on personal knowledge."); *see also* 28 U.S.C. § 1746. "Once the moving party has [made a case for summary judgment], the nonmoving party cannot rest on his pleadings but must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini v. Oberlin Coll.*, 440 F.3d 350, 357 (6th Cir. 2006).

Principal Baughman then called Plaintiff and indicated that he was aware of what had transpired during the school recess and needed to meet with Plaintiff. (*Id.* at 12-13.) Principal Baughman told Plaintiff that he was not to be on school property-- was being suspended from his coaching duties-- until they met. (*Id.* at 13.) Two days later, on January 9, 2013, Plaintiff came to DHS to meet with Principal Baughman. (*Id.*)

At the meeting, Plaintiff provided an account of the events on December 25 which paralleled the narrative provided in the police officers' report, with the exception that Plaintiff claimed he was cooperative with the officers. (*Id.*) Later that day, Principal Baughman called Plaintiff and told Plaintiff that he was being relieved of his coaching duties. (*Id.* at 18.) Principal Baughman expressed concern about Plaintiff's failure to inform the school about something so severe and his belief that Plaintiff had made a bad decision by using and bringing what resembled a weapon onto school property. (*Id.* at 18-19.) When Plaintiff asked if he could ever come back, Principal Baughman told Plaintiff that he was being suspended for a year (or had to stay off school property for that period) and that if he wanted to return and a coaching position was open, he would need to interview for it like anyone else. (*Id.* at 20.) Principal Baughman told Plaintiff that other than Coach Mifsud and the school's central office, no one needed to know that he had been suspended: "[I]f he wanted to say that he had resigned or stepped away

7

from coaching or whatever it was, [Principal Baughman] would support however he wanted people to know about it." (*Id.*)

Plaintiff then requested a meeting to discuss his possible reinstatement with the DPS Superintendent, Defendant Brian Whiston ("Superintendent Whiston"). Superintendent Whiston testified during his deposition in this matter that Principal Baughman already had informed him about the incident at the school on December 25. (ECF No. 22, Ex. C at 8.) Superintendent Whiston indicated that he "wasn't very pleased" because the incident had happened not too shortly after a shooting in the school and he was concerned about school safety, as well as a school employee's use of his key to unlock a gate and drive across school property. (*Id.* at 8-9.) According to Superintendent Whiston, Principal Baughman said that he planned to address the issue by suspending Plaintiff from coaching for one year. (*Id.* at 10.) Superintendent Whiston thought this was a good idea because they "suspend kindergartners for doing the same thing from a year of school . . . that it was appropriate if an adult did it that they face the same punishment." (*Id.*) Superintendent Whiston indicated that Principal Baughman made the decision to suspend Plaintiff, but that he concurred with the decision. (*Id.*)

Superintendent Whiston met with Plaintiff and Plaintiff's legal counsel a month or two after Plaintiff was suspended. (*Id.* at 11.) Plaintiff (directly or through his counsel) asked Superintendent Whiston two things: (1) whether he

would reinstate Plaintiff; and (2) whether Plaintiff could coach at Edsel Ford or Fordson, the two other DPS high schools. (*Id.*) According to Superintendent Whiston, he responded that he would get back to Plaintiff concerning these requests. A number of days later, Superintendent Whiston conveyed to Plaintiff that he had to sit out a year and that this suspension applied to any DPS school. (*Id*. at 12-13.) In his brief submitted in response to Defendants' motion, Plaintiff claims that Superintendent Whiston told him at their meeting that he could apply for positions at Fordson or Edsel Ford, just not DHS.[2] (ECF No. 22 at Pg ID 322.) Although citing no supporting evidence, Plaintiff claims that, unlike DHS, Fordson and Edsel Ford consist of a predominately Arab student body. (ECF No. 22 at Pg ID 322.) Defendants contend in their reply brief that Plaintiff actually is incorrect and the majority of the DHS student body is of Arab descent. (ECF No. 23 at Pg ID 408 n.1.)

Plaintiff alleges in his Complaint that in April 2013, Coach Mifsud, DHS' head varsity football coach, announced that he would be leaving the school. (ECF No. 1 ¶ 53.) According to Plaintiff, Coach Mifsud's position was open to anyone, not only DPS employees. (*Id.* ¶ 55.) Plaintiff believes that he was next in line for

---

[2] Although Plaintiff does not cite evidence to support his assertion of what Superintendent Whiston said during their meeting, the Court has found evidentiary support in Plaintiff's deposition testimony. (*See* ECF No. 19, Ex. A at 62.)

the head coach position but that his suspension prevented him from applying "and essentially securing the position". (ECF No. 22 at Pg ID 324-25.)

### III. Applicable Law and Analysis

To establish discrimination based on his national origin or religion in violation of Title VII, Plaintiff must "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Defendants contend that Plaintiff lacks direct evidence of discrimination and Plaintiff does not counter this assertion in his response brief.[3] Thus Plaintiff must offer circumstantial evidence to prove his case.

---

[3] As indicated in the previous section, Plaintiff alleges that Superintendent Whiston told him that he could apply for coaching positions at Fordson or Edsel Ford, which Plaintiff claims have higher populations of Arab-American students than DHS. Plaintiff understands Superintendent Whiston to have been "insinuating that it was ok for [Plaintiff] to go coach at a school with a predominantly Muslim student body." (ECF No. 19 at Pg ID 107, quoting Ex. F No. 16; *see also* Ex A. at 62.) Putting aside the question of whether Plaintiff's assertions regarding the demographics of DPS' high schools is correct, Superintendent Whiston's statement, assuming it was made, does not constitute direct evidence of discrimination. "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture,* (cont'd...)

10

When a plaintiff proves his case through circumstantial evidence, he first must establish a prima facie case of discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). To make this showing, the plaintiff must establish the following: "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citations omitted). If the plaintiff establishes such a prima facie case, an inference or rebuttable presumption of discrimination arises. *DiCarlo*, 358 F.3d at 414.

In order to rebut this inference, the defendant must "articulate some legitimate, non-discriminatory reason" for the adverse employment action. *Id*. If the defendant articulates such a reason, the plaintiff must " 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' " *Id*. at 414-15 (quoting *Burdine*, 450 U.S. at 253). The plaintiff can establish pretext by showing that: (1) the stated reason had no basis in fact; (2) the stated reason was not the

---

*Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (internal quotation marks omitted).

11

actual reason; or (3) the stated reason was insufficient to explain the defendant's action. *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1126 (6th Cir. 1998); *Wheeler v. McKinley Enterprises*, 937 F.2d 1158, 1162 (6th Cir. 1991).

In their summary judgment motion, Defendants argue that Plaintiff cannot demonstrate a prima facie case of discrimination because he lacks evidence to show that he was replaced by a person outside of his protected class (i.e., someone who was not of Arab descent or Muslim) or that he was treated less favorably than a similarly situated individual outside of his protected class. To make this showing, Plaintiff asserts in response that "[s]everal employees of Defendants committed several and sometimes both severe and criminal acts of misconduct and simply received short-term suspensions while retaining their coaching positions." (ECF No. 22 at Pg ID 327.) He also asserts that "some employees had numerous incidents involving professional misconduct, however, these incidents were never even documented and the employees went free without any type of disciplinary action being taken against them." (*Id.*) The evidence Plaintiff offers, however, does not support his assertions.[4]

---

[4] Notably, Plaintiff does not offer evidence concerning "[s]everal employees" who "committed several and sometimes both severe and criminal acts of misconduct" or "some employees" who "had numerous incidents involving professional misconduct." (ECF No. 22 at Pg ID 327.) As will be discussed, he presents evidence relating to incidents involving only three other employees and none of those individuals appear to have engaged in criminal acts.

More specifically, in his response brief, Plaintiff makes the following statement:

> Several of the employee files reviewed contained atrocious acts by DPS employees where the discipline that was administered was nothing more than a slap on the wrist. In fact, one personnel file in particular contained complaints and allegations against a male DPS coach and teacher involving the inappropriate touching of female students. There were several letters from concerned parents requesting their child be removed from that Coach's/Teacher's course and several statements provided by the students/victims themselves. The complaints and allegations were substantiated and this particular employee received the following disciplinary action; a three-day unpaid disciplinary suspension, a last chance warning, and an involuntary transfer to an elementary school in the south end of Dearborn, MI that has a predominately Arab student body.

(ECF No. 22 at Pg ID 323.) Although Plaintiffs' statement concerning the misconduct of other employees continues, the Court pauses here to note that aside from a disciplinary letter from a single DPS employee's file (*Id*. Ex. D), Plaintiff does not offer evidence from any other personnel file of a DPS employee. Moreover, the one document submitted does not describe "atrocious acts" for which the employee received "nothing more than a slap on the wrist." It also does not support Plaintiff's claim that the employee was accused of "inappropriately touching underage female students" (at least as suggested by Plaintiff's statement), for which the employee received only an unpaid disciplinary suspension, last chance warning, and involuntary transfer. (*Id*.)

Instead, the document describes an incident involving two teachers who students claimed partially blocked a door and then required the students to pass through.  (*Id*. at D1297, D1309-D1310)  Some students claimed that they could not get through without touching the teachers and one female student reported that "in getting around the two [teachers] one of the girl's legs touched *the other teacher's* body and that *he* [the other teacher] touched one of the girls on the front of her thighs as she passed through."  (*Id*. at D1297, emphasis added.)  Documents from the second teacher's file are not submitted by Plaintiff and Plaintiff does not indicate what punishment that teacher received as a result of his conduct.  Plaintiff's somewhat reckless, unsupported assertions to demonstrate disparate treatment continue, however.

>He states in his brief:
>
>> What may be more alarming than this particular personnel file were the countless incidents of professional misconduct by non-Arab employees of DPS that were not documented anywhere but were confirmed by the testimony of Defendants' [sic] as well as Mifsud, and [Gail] Shenkman [DPS' associate superintendent]. One particular non-Arab coach committed several acts of professional misconduct that eventually lead [sic] to him leaving the district that were not documented in their [sic] personnel file but were confirmed by the Defendants' testimony. There seemed to be some confusion as to whether or not the individual was terminated or allowed to resign. . . . During his deposition, Baughman referred to two separate non-Arab coaches losing their positions due to incidents that he considered to be their "final straw." . . . Based on Baughman's testimony, it can be assumed that the two non-Arab coaches that lost their positions due to a "final straw" had received opportunities to rehabilitate themselves in the past.

14

(ECF No. 22 at Pg ID 323-24 (citation omitted).) Again, Plaintiff offers no evidence of "countless incidents of professional misconduct by non-Arab employees of DPS" as purportedly "confirmed by the testimony of Defendants[]", Mifsud, or Associate Superintendent Shenkman.[5]

The deposition testimony cited to by Plaintiff contains references to only two DPS employees.[6] (*See* ECF No. 22, Ex. A at 23-24; Ex. B at 38-45; Ex. C at 14-15; Ex. E at 25-27.) One of those employees, CJ Kreger, was fired or allowed to resign after demonstrating a lack of commitment to coaching and, as the "final straw", calling the opposing fans "rednecks" at a basketball game. (*See id.*, Ex. B

---

[5]Plaintiff also asserts in his brief that Principal Baughman "*might have* inappropriately touched a female student." (ECF No. 22 at Pg ID 328, emphasis added.) However, Plaintiff's charge is made again without evidentiary support. In fact, Plaintiff states in his response brief: "It was brought to our attention that there were allegations of such an incident, however, not much else was known." (*Id*.) During his deposition, Principal Baughman testified that he had never been accused of misconduct during his tenure. (ECF No. 22, Ex. B at 59-60.) When asked about the allegation, Superintendent Whiston testified: "I had one individual who made such a claim but had no facts or basis and said that it's just their intuition, but they had no fact or base to back it up with." (*Id*., Ex. C at 30-31.) Despite lacking evidentiary support for the charge itself, Plaintiff then accuses Principal Baughman and Superintendent Whiston of engaging in perjury based on their denials concerning the alleged incident. The Court agrees with Defendants, as noted in their reply brief (ECF No. 23 at Pg ID 413 n.4), that Plaintiff's charges of perjury and of the alleged incident itself are "reckless" and worthy of sanctions under Rule 11 of the Federal Rules of Civil Procedure.

[6] During their depositions, Superintendent Whiston and Associate Superintendent Shenkman were unable to recall specifics concerning the misconduct of the two DPS' employees. (*See* ECF No. 22, Ex. C at 14-15; Ex. E at 25-29.)

at 38-39.) The other individual, John Lenders, was not brought back to his position coaching two major sports because Principal Baughman believed he also lacked commitment, parents complained that he was not giving their kids adequate playing time, he was talking loudly and laughing in the hallway during the playing of the National Anthem at a game, and, as the "final straw", responded to kids throwing candy on the floor at a game by picking up a microphone and saying "would you idiots that are throwing things on the floor knock it off." (*Id*. at 40-41.) Principal Baughman's use of the phrase "final straw" (ECF No. 22, Ex. B at 38, 41) during his deposition has led Plaintiff to "assume that the two non-Arab coaches that lost their positions due to a 'final straw' had received opportunities to rehabilitate themselves in the past" and had engaged in other misconduct. (ECF No. 22 at Pg ID 324.) The evidence, however, does not support Plaintiff's assumption (as it does not support many of Plaintiff's other factual assertions and conclusions).

The Court cannot find, as Plaintiff contends, that his misconduct was less serious than the conduct of his comparators or that they were given a second chance after engaging in misconduct similar to Plaintiff. And while Plaintiff believes that his conduct was not "unbecoming of an assistant coach", Principal Baughman and Superintendent Whiston apparently disagreed. As the Sixth Circuit has "oft times repeated, 'it is inappropriate for the judiciary to substitute its

judgment for that of management.' " *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) and citing *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 960 (8th Cir. 1995) (holding that federal courts do not sit as a "super-personnel department") and *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (same)). If anything, the treatment of Plaintiff's comparators reflects that Principal Baughman fires or asks his coaches to leave his school when they engage in misconduct that he finds unbecoming or unprofessional, even if the conduct is not illegal, immoral, or unethical. Thus it seems that Plaintiff in fact was treated exactly the same as coaches outside his protected class.

For these reasons, the Court agrees with Defendants that Plaintiff fails to present evidence suggesting that he was treated less favorably than other DPS employees or coaches outside his protected class. As such, he fails to make out a prima facie case of discrimination.

But even if Plaintiff succeeded in making out a prima facie case of national origin or religious discrimination, the Court finds that Defendants have met their burden of showing a legitimate, non-discriminatory reason for Plaintiff's suspension. Contrary to Plaintiff's assertion, the exact reason for his suspension is not "still unknown." (ECF No. 22 at Pg ID 330.) Principal Baughman and Superintendent Whitson did not give different reasons for the decision. While

Principal Baughman may have expressed that one of the reasons for the decision was Plaintiff's failure to report the December 25, 2012 incident to the school, it is clear from his deposition testimony that his decision to suspend Plaintiff was based on the incident itself (that Plaintiff used his key to gain access to school property, brought what appeared to be a weapon onto school grounds, and responded inappropriately to the police officers' response to the situation). (*See* ECF No. 22, Ex. B at 16, 18-19.) During his deposition, Superintendent Whiston provided a similar explanation for supporting Principal Baughman's decision. (*Id.*, Ex. C at 9-10, 13.) In response to Defendants' motion, Plaintiff makes no legitimate attempt to demonstrate that this reason was a pretext for discrimination.[7]

Accordingly,

---

[7] In his response brief, Plaintiff claims that he was suspended in order to deny him the opportunity of becoming the "first ever Arab American Head Football coach in the school's history. (ECF No. 22 at Pg ID 324-25.) Plaintiff offers absolutely no evidence to support this theory. Moreover, Coach Mifsud did not announce his retirement until March 2013-- two months *after* Plaintiff was suspended. (ECF No. 19, Ex. B at 14.) While Plaintiff asserts that Coach Mifsud's departure "was known long before he actually resigned" (*id.*), he again makes this statement without offering any factual support. Defendants, on the other hand, offer evidence to show that "[w]hile DHS personnel may have been aware that Coach Mifsud had interviewed for jobs outside DPS in the past, no one at DPS or DHS knew of Mr. Mifsud's departure from DHS until March 2013." (*Id.* at 10-11.)

**IT IS ORDERED**, that Defendants' motion for summary judgment is **GRANTED**.

s/ Linda V. Parker<br>
LINDA V. PARKER<br>
U.S. DISTRICT JUDGE

Dated: April 13, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, April 13, 2015, by electronic and/or U.S. First Class mail.

s/ Richard Loury<br>
Case Manager